JASPER CLAYBROOK v. BOARD OF COMMISSIONERS OF ROCKINGHAM COUNTY.

*Municipal Bonds—Elections—Qualified Voters—Registration.*

1. The registration list is *prima facie* evidence as to who constituted qualified voters in a municipality, notwithstanding the list was recorded in the same book in which the municipal authorities kept a record of their proceedings.

2. The purchaser of municipal bonds is not required when looking into the validity of an election on the issue of bonds for a subscription by a municipality to the stock of a railroad company, to go further than to find, from the certificate of the registrar that a majority of the qualified voters of the municipality had voted for the subscription.

3. One who, before buying bonds issued under a vote of the qualified voters of a town, examines the election proceedings, and finds that a majority of the registered voters voted in favor of the issue, need not inquire whether the voters were legally registered where the registrar certified that each voter was so registered, and the returns of the canvass by the registrar and judges of election were approved by the county commissioners, though the result of the election was not formally declared by such commissioners as required by Laws 1887, ch. 87.

CIVIL ACTION, tried before *Bryan, J.*, and a jury, at January Term, 1895, of ROCKINGHAM Superior Court, and was brought for the purpose of contesting the validity of an election held on November 3rd, 1888, at the town of Stone-

ville, in Rockingham county, upon the subscription by said town of $5,000 to the capital stock of the Roanoke & Southern R. R. Company. The material facts 'appear in the opinion of Associate Justice AVERY. There was verdict and judgment for the defendants and plaintiffs appealed.

*Messrs. Reid & Reid* and *Dillard & King*, for plaintiffs (appellants).
*Msssrs. Watson & Buxton* and *A. E. Holton*, for defendants.

AVERY, J. : It seems that the main questions before us were virtually settled by the carefully considered opinion of Justice MACRAE on the former appeal. *Claybrook* v. *Commissioners*, 114 N. C., 453. The suggestion then made was that in consequence of the failure of the board of county commissioners, after approving of the returns, to formally declare the result of the election, the plaintiff was left at liberty to impeach the validity of the bonds by showing that a majority of the qualified voters of the town of Stoneville did not vote in favor of the subscription. The parties agreed upon the single issue, "Did a majority of the qualified voters of the town of Stoneville vote in favor of subscription ?" It was not denied that the burden was upon the plaintiff to show ground for impeaching their validity. The registered voters are presumably the qualified voters. The defendant Commissioners, as appears from their minutes, had previously ordered a registration. The registrar certifies a list of 25 names as that of the registered voters of the town, and the records of the town show that the same 24 persons originally, and subsequently seven others, were registered as voters in the same book in which the records were kept. Twenty-one of these electors are returned as voting in favor of subscription. All of

the testimony tended to show, what already appeared from the returns, that 21 of the whole number cast their ballots in favor of subscription, and constituted a majority of the qualified voters. While the return of the canvass by the judges of the election and the registrar and the approval of the board of county commissioners were not conclusive, they are *prima facie* correct. Hence it was that the plaintiff started out with the laboring oar. In order to overcome the presumption that the election had been conducted fairly and lawfully, the plaintiff proposed to offer every elector who voted, and did introduce a number of them to show that, while they had voted, they either did not register or had no recollection of having done so. They also offered one J. W. Moore, who testified that he was appointed registrar, but that he made out and recorded in a book the names of the voters without swearing them and pursuing the course prescribed by law in registering voters, though he afterwards voluntarily certified that he had registered every one of these names and forwarded his certificate as a part of the return of the election to the board of county commissioners.

We do not understand the rule to be that the holder of the bond is bound in prosecuting his inquiries to go behind what appears upon the records of the town to be a registry of voters, however informal, and also behind an official certificate of the municipality after finding it to be true, that a majority of those very persons actually cast their ballots for the subscription. The question presented by the issue is not, whether the electors were sworn and complied with all of the requirements of the law in having their names recorded upon the registered list of voters, but whether, being registered, however irregularly, a majority of the whole number gave their assent to the creation of the proposed municipal debt. As was said in *Bank* v.

*Commissioners*, 116 N. C., 339, "The imperative require-
ment of the Constitution is that there shall be a concur-
rence of the legislative and popular will, the former evi-
denced by a grant of authority to vote, the latter by the
record that a majority of the qualified voters have cast
their ballots in favor of creating the debt." The authority
for holding the election was declared ample and the form
of the ballots was adjudged legal on the former appeal.
The question whether "the sense of the voters was fairly
taken" is all of the original controversy left to be now set-
tled. The plaintiff has not only failed to prove that a
majority of the qualified electors did not signify their
assent to the creation of the proposed debt, but the evi-
dence shows beyond all question that a large majority
voted for the subscription. The registration book was
*prima facie* evidence as to who constituted the qualified
voters (*Rigsbee* v. *Durham*, 98 N. C., 81) no matter how
informally the registration was done, and notwithstanding
the fact that the list was recorded in the same book in
which the municipal authorities kept minutes of their
proceedings.

The principle which underlies the decision in *McDowell*
v. *Construction Co.*, 96 N. C., 514, is that where elections
are held to ascertain the sense of the qualified voters of a
municipality as to the creation of bonded indebtedness,
the subscriptions may be set aside, or the bonds if issued
may be invalidated by a direct proceeding in which it is
shown that a majority of the qualified voters did not vote
or were deprived of the opportunity to vote. In that case
the plaintiff proposed to show that qualified voters, who
desired to vote against the subscription, were prevented
from doing so on account of the wilful failure of the con-
stituted authorities to provide for registration. The prop-
osition there was to show that if the sense of the electors

had been fairly and lawfully ascertained, it would have appeared that a majority of the qualified voters were opposed to, or at least not in favor of, making the proposed subscription. The Court was there asked, upon affidavits tending to show that the sense of the voters had not been fairly ascertained, to grant an injunction till the hearing. The Court granted the extraordinary relief sought in the interest of fair play, until it could be determined whether by a failure to comply with the forms of law, the voters, whose province it was to pass upon the question, had been deprived of the opportunity to exercise the power vested in them by the Constitution. But here there is no pretense that the certificate of those, who held the election in so far as it sets forth that an overwhelming majority voted for subscription, is not entirely correct. If the failure to declare the result made the record of the county commissioners under the Act (Laws 1887, ch. 87) inconclusive, and put the purchasers of the bonds on notice to look behind the returns, they were not bound to go further when they found an apparent registration and a vote of a majority of the qualified voters for subscription. It was not incumbent on them to interview the registrar to see whether his certificate was correct, but they had a right to assume that he had done his duty. They were not required, after ascertaining that those whose names were borne upon the certificate and the informal registration books constituted the registered and presumably the qualified voters of the town, to interview each one and allow him to contradict the fact of registration. When an elector is allowed to deposit his ballot, the burden is on one who questions its validity to show, by a preponderance of testimony, the truth of such facts or circumstances as are relied upon to establish the disqualification. *Boyer* v. *Teague*, 106 N. C., at page 633. Being put upon notice, the purchaser in

this case must be presumed to have invested his money upon the idea that the registrar certified to the truth as to the registration, and a court of equity will not permit the registrar and the voters, who fairly exercised the privilege of voting, to contradict and stultify themselves in order to avoid an obligation, which they seemed not only willing but anxious to incur.    Courts of equity will lend their aid to prevent fraud and deception, but where mere irregu- larities and informalities in conducting an election are relied upon as the ground of impeachment, they will not countenance an attempted repudiation by tax-payers of a municipality, who have by casting their ballots signified their assent to the creation of a bonded debt, and enjoyed the benefits of the improvement for which the money of the holder of the bonds was expended.    In this view of the evidence it is not material to inquire in this proceeding whether a particular voter or voters were registered informally or without taking the prescribed oath.    What- ever might have been the consequences to the registrar or voter in another action, it is certain that the purchaser of a bond is not bound to see, in order to protect himself, that every voter or a majority of the electors were registered on their own application or took the oath prescribed by law in such cases.    There is a reasonable limit to the duty of inquiry imposed by the failure to declare the result, and we think that it is reached when the proposed purchaser finds that in truth a majority of the qualified voters have, by casting their ballots, assented to the creation of the debt, and that the vote has been regularly canvassed by the officers who held or purported to have held the elec- tion and were authorized to certify the result to the board of county commissioners.    The purchaser should not be required to do more than it was the duty of the county board to do, perliminary to announcing the result,—ascer-

tain that the sense of a majority of the voters was clearly ascertained to be in favor of making the subscription.

In pursuing the investigation suggested by the failure to declare the result, the purchaser was only bound to see that there had been, according to the records of the registration and voting, a substantial compliance with the requirements of the statutes as to matters merely formal. *Railroad* v. *Commissioners*, 116 N. C., 563. It was his duty to see that the legislature had authorized the holding of the election, and that the sense of a majority of the qualified voters had been expressed by casting their ballot in favor of creating the debt. *Bank* v. *Commissioners*, *supra*. There was no error.

No Error.